UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SUZETTE M. WELTON<br><br>Petitioner,<br><br>vs.<br><br>DEAN MARSHALL,<br><br>Respondent. | 3:12-cv-00137-TMB-DMS<br><br>**INITIAL REPORT AND RECOMMENDATION REGARDING RESPONDENT'S MOTION TO DISMISS PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS [Doc. 29]** |

I.  **MOTION TO DISMISS DUE TO FAILURE TO EXHAUST**

On June 26, 2012, Suzette M. Welton (Welton) filed a *pro se* Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254. (Doc. 1). On April 22, 2013, Welton, now assisted by appointed counsel, filed an Amended Petition for Habeas Corpus, asserting four claims of ineffective assistances of counsel. (Doc. 22 at 10-20).[1] Welton concedes that three of her claims are new and unexhausted in state court,[2] but asserts that one claim has been exhausted. (Doc. 22 at 5). Welton asks the Court to stay her mixed petition and hold it in abeyance until the Alaska courts rule on her three unexhausted claims. (Doc. 22 at 5-6). The State of Alaska moves to dismiss Welton's amended petition, arguing that all of Welton's claims are unexhausted in state court, including the claim she asserts has been exhausted. (Doc. 29). The parties have fully briefed the issue, and it is now ripe for the Court's consideration.

---

[1] The delay between Welton's original petition and her amended petition is due to continuances granted by the Court to allow counsel to become familiar with the large state-court record. (Doc. 22 at 5) ("Several continuances have been granted . . . to allow counsel time to locate files of previous counsel including 15,000 pages of discovery and amounting to 21 boxes of files.").
[2] Welton explains that these claims pertain to "new evidence in the form of Dateline/NBC Investigation materials including new interviews with the District Attorney, Lead State Investigator Wallner, Karen Polak, and Luke Dubber which may show Ms. Welton's innocence." (Doc. 22 at 4).

Federal law prohibits federal courts from providing relief to a state habeas petitioner on a federal constitutional claim unless she has exhausted every avenue for relief on her claim in the state court system. *See* § 2254(b)(1)(A). If a habeas petitioner fails to fairly present her federal claim at each appropriate state court, including the state supreme court with the power of discretionary review, then she has not exhausted her possible state court remedies and she may not raise that claim in a federal habeas proceeding. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004). Welton did not fairly present the federal nature of her ineffective assistance of counsel claim to the Alaska Supreme Court for its review and consideration. As a result, she failed to exhaust the claim in state court and her habeas petition must be dismissed.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On May 31, 2002, Welton was convicted in Alaska state court of first-degree murder, second-degree murder, attempted first-degree murder, and first-degree arson. (See Trial Transcript Vol. 8 at 5158-59) (hereinafter Trans.).[3] Superior Court Judge Milton M. Souter sentenced Welton to 99 years in prison. (See Trans. Vol. 8 at 5226). After unsuccessful direct appeals and postconviction relief proceedings in state court, Welton has now turned to the federal courts seeking relief pursuant to § 2254. (See Doc. 1).

### A)  Trial and Direct Appeal

Welton's conviction arose out of a fire that burned her Wasilla home where she lived with her three children—six-year-old daughter, Bree; fourteen-year-old, Samuel; and sixteen-year-old, Jeremiah. *Welton v. State*, 2004 WL 1837692, *1 (Alaska App. 2004). On the night of September 15, 2000, Welton served Jeremiah and Samuel Pepsi and fruit drinks that tasted "funny" to them. *Id.* at **1-2. The drinks made the brothers tired and they went to bed upstairs.

---

[3] The trial and postconviction relief transcripts were provided to the Court on compact discs.

*Id.* at *2. Bree slept downstairs with Welton. *Id.* at *1. Sometime that night, Jeremiah awoke to find the house on fire. *Id.* at *1. Because the cranks to his windows were missing, Jeremiah broke a window and jumped from the second story to the ground; he sustained cuts to his hands and feet from the fall. *Id.* at *1. Samuel died in the fire from smoke inhalation. *Id.* at *1. Bree was carried to safety by Welton. *Id.* at *1.

The ensuing investigation pointed to Welton as an arsonist who started the fire. Responding firefighters and investigators concluded that the fire had been intentionally set on the second floor. *Id.* at *1.[4] Police discovered that Welton's grocery-store club card had been used two days before the fire to buy a 2.5 gallon gas can and Sleepinol, which is a non-prescription sleeping aid containing diphenhydramine. *Id.* at *2. The club card was also used to purchase Pepsi and fruit drinks on the day of the fire. *Id.* at *2. An autopsy of Samuel's body revealed that he had high levels of diphenhydramine in his system, and Jeremiah's shirt contained traces of diphenhydramine, which likely occurred from perspiring while wearing the shirt. *Id.* at *2. The bottles Welton used to serve the drinks to Samuel and Jeremiah were recovered and tested positive for diphenhydramine. *Id.* at *2. Three months prior to the fire, Welton purchased whole-life insurance policies for Jeremiah and Samuel and named herself as the beneficiary of both policies. *Id.* at *2. Welton was subsequently indicted by a grand jury. *Id.* at *1.

The Alaska Public Defender Agency appointed two trial attorneys to assist Welton: Gregory Heath and George Davenport. (Doc. 29-4 at 2). Welton's defense at trial was that the fire was an unexplained tragedy. She pointed out that anyone, including her sons, could have used her grocery-store club card to purchase the gas can, Sleepinol, and the Pepsi and fruit

---

[4] The responding firefighters noted that the fire continued to reignite when water was applied to the flames and there was a strong odor of "flammable or combustible fuel" throughout the second floor. *Id.* at *1. Welton's next-door neighbor also told investigators that he awoke around 4:20 a.m. to an "explosion that shook his entire house." *Id.* at *1.

*Welton v. Marshall*  Initial R&R re Motion to Dismiss
3:12-cv-00137-TMB-DMS  3

drinks. *Id*. at *2. Jeremiah testified for the State. *Id.* at *1. To undermine Jeremiah's testimony that the drinks Welton provided on the night of the fire tasted funny and had made him and Samuel tired, Welton called Jeremiah's friend Luke Dubber to testify that Jeremiah had used sleeping pills, marijuana and alcohol in the past. *Id*. at *2. The jury convicted Welton on all counts, and Judge Souter sentenced her to 99 years in prison. *Id*. *2.

Welton appealed to the Alaska Court of Appeals, arguing that there was insufficient evidence of her guilt to support her conviction. *Id*. at *3. The Court of Appeals affirmed Welton's conviction, reasoning that a review of the record in the light most favorable to the State revealed sufficient evidence for the jury to conclude beyond a reasonable doubt that Welton committed all of the crimes of which she was convicted. *Id*. at *4.

### B) Postconviction Relief Proceedings

Welton then filed a petition for postconviction relief, asserting she received ineffective assistance from trial counsel Heath and Davenport. (Doc. 29-3 at 15). Alaska Superior Court Judge Eric Smith held a three-day evidentiary hearing. (Doc. 29-4 at 1). Welton claimed, among other things, that Heath and Davenport's failure to confront Jeremiah on cross-examination with his statement to an Alaska State Trooper that he had used "sleeping pills" fell below the minimum level of professional conduct. (Doc. 29-3 at 16). Jeremiah's statement to the trooper consisted of, in pertinent part:

> **Trooper**: Do you know of [Suzette Welton] taking sleeping pills?
>
> **Jeremiah**: Nope. I don't know anything of it. She'd never take sleeping pills. She tells me and Sam, " 'cause I remember I use to take sleeping pills when I had soccer practice . . . ."
>
> **Trooper:** Uh-huh

(Doc. 29-3 at 16).

Yet, at trial, Jeremiah had testified that he had never tried "sleeping aids." (See Tran. Vol. 4 at 1623). During Welton's trial, Heath extensively cross-examined Jeremiah about his recreational drug-use, but he did not question him about using sleeping aids or about the discrepancy between his statement to the trooper and his trial testimony. (Doc. 29-4 at 24-25).

At the postconviction evidentiary hearing, neither Davenport nor Heath remembered Jeremiah's statement to the trooper and they also could not remember if they had known about it at the time of the trial. (Trans. of Postconviction Hearing at 116-17, 189-90). Heath explained, however, that not cross-examining Jeremiah on his statement was likely intentional, given the defense strategy of calling Luke Dubber as a surprise witness to testify that he had taken diphenhydramine with Jeremiah before:

> **Welton's Counsel**: Would you agree that that [failing to cross-examine Jeremiah on his statement to the trooper] was an omission?
>
> **Heath:** Depends on our strategy at the time. I mean, as you probably recall looking at the transcript, we had a—for lack of a better word, a witness that we were going to call in our case-in-chief that had not been interviewed by the state. And he was a young man that had been at the house with both boys, and they had been experimenting with diphenhydramine. And he was going to come in and testify, and he did come in and testify. His name was Luke. And we thought at that point in time we were just going to hold off on bringing up the issue of the boys using it until our case-in-chief. So it may have been a strategy that we did not want to expose Luke to any sort of investigation at that time because the state had not interviewed him. And we were afraid that—he was a very sensitive young man and he was afraid to come to court as it was and we didn't want to overwhelm him. So we had a strategy to hold off . . . .

(*Id*. at 189-90). Heath nevertheless said that, in hindsight, cross-examination of Jeremiah about the prior use of sleep aids would have been worthwhile. (*Id*. at 191).

Judge Smith ruled that Heath's strategy was understandable given that he did not want to tip the State off that he was going to call one of Jeremiah's friends to testify about his sleeping-pill use.

> The court finds that Mr. Heath had a valid tactical reason not to question Jeremiah prior to the testimony of Luke Dubber. Mr. Heath had an objective witness unknown to the state who could directly contradict Jeremiah's claim that he never took sleeping pills. He also understandably did not want the state to think that he had some evidence on this score, or to turn the state's attention to this very valuable rebuttal. It therefore was not incompetent not to have raised the matter on cross examination prior to the defense's case.

(Doc. 29-4 at 26).

Judge Smith acknowledged, however, that Heath's proffered strategy did not explain why Heath did not recall Jeremiah after Dubber testified to confront Jeremiah with both that testimony and the admission he had made to the trooper. (Doc. 29-4 at 26). Judge Smith concluded that the only plausible reason for this omission was that Heath and Davenport "simply overlooked [Jeremiah's statement to the trooper] in the thousands of pages of discovery that had been provided." (Doc. 29-4 at 27). Although Judge Smith classified this oversight a "close call" in regards to whether Heath and Davenport had competently represented Welton, he concluded their oversight of a single statement in the record did not overshadow the enormous preparation that they had undertaken to prepare for Welton's trial, *and* even assuming it was incompetent to overlook Jeremiah's statement, Welton was not prejudiced because allegations of Jeremiah's recreational use of sleeping pills was presented to the jury through Dubber's testimony.

> While a close call, even under the clear and convincing evidence standard, the court finds that the failure to ask Jeremiah about this admission was not incompetent. The record in this case was vast, and defense counsel's overall preparation was enormous, given the many volumes of defense notes and materials that were presented into evidence in this hearing. The jury was presented with what a competent attorney could readily find was credible evidence of the use of sleeping pills by Jeremiah and Samuel, since that evidence came from a good friend of Samuel's. The jury also was presented with a considerable amount of email traffic containing admissions of drug use by Jeremiah that contradicted his trial testimony; given the cross examination that

> occurred, a competent attorney could also readily determine that the cross examination on this point both underscored Jeremiah's drug use and undercut his overall credibility. Given this context, and the many other attacks on the state's case that counsel made, the failure to find this admission and bring it to the jury's attention does not meet the Risher standard.

(Doc. 29-4 at 28). Judge Smith denied Welton's petition for postconviction relief. (Doc. 29-4 at 32).

Welton appealed to the Court of Appeals of Alaska, arguing that it was unreasonable for Judge Smith to attribute her counsel's failure to cross-examine Jeremiah about his statement to the trooper about using sleeping pills to strategy because both Heath and Davenport testified that they did not recall knowing about that statement. *See Welton v. State*, 2011 WL 2151850 (Alaska App. 2011). The Court of Appeals disagreed, holding that Heath strategically planned on not cross-examining Jeremiah about his prior use of sleeping medication because he wanted to surprise the state with Luke Dubber's testimony that he had used diphenhydramine with Jeremiah on a prior occasion:

> [Welton's argument] misses the point of attorney Heath's testimony on this manner. Heath testified that he did not want to cross-examine Jeremiah about his use of sleeping pills because he (Heath) was keeping Dubber's testimony in reserve, and he did not want to alert the prosecutor to this issue. This was obviously a tactical decision. The real question is whether a competent attorney could have come to this decision, or kept to this decision, *after being appraised of Jeremiah's prior statements to the police officer.*
>
> Judge Smith concluded that, despite the existence of this prior statement, Heath's approach to this issue remained competent. The record supports that conclusion.

*Welton*, 2011 WL 2151850, at *12 (emphasis in original).

Welton then filed a Petition for Hearing with the Supreme Court of Alaska, which forms the controversy of the instant motion. (Doc. 29-9). There, Welton argued the Court of Appeal's opinion committed three points of error:

> It (a) wrongly suggests that the decision not to examine Jeremiah was tactical, rather than a mistake made out of ignorance, (b) fails to correct the trial court's ruling on competence, which conflated the two prongs of *Risher* by taking lack of prejudice to show competence, and (c) erroneously defers to the trial court's analysis of the record, which properly read, shows both incompetence and prejudice to Mrs. Welton.

(Doc. 29-9 at 2). Welton supported her argument on these three points with legal citations exclusively to Alaska caselaw, with the exception of a single citation to *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). (*See* Doc. 29-9 at 2-11). In its opposition, the State likewise relied exclusively on Alaska caselaw to support its argument, except for one citation, *United States v. DeCoster*, 624 F.2d 196, 211 (D.C. Cir. 1976). (Doc. 29-10 at 9). Throughout the Petition for Hearing, Welton argued that the state standards of ineffective assistance of counsel were violated. *Risher v. State*, 523 P.2d 421 (Alaska 1974) was cited in the text of the petition eleven times. The Supreme Court was urged to consult both prongs of the *Risher* test—the competency prong and prejudice prong. The federal standards articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), were not referenced anywhere in the petition. Nor was the Federal Constitution or the Sixth Amendment right to counsel.[5] The Alaska Supreme Court summarily denied Welton's petition in a one-page order. (Doc. 29-11).

### C) Federal Habeas Petition

Welton now seeks relief in Alaska's Federal District Court, under 28 U.S.C. § 2254. (Doc. 22). In contrast to her Alaska Supreme Court petition, Welton's federal petition specifically alleges that her Sixth Amendment rights were violated by Heath's failure to cross-examine Jeremiah about his statement and contains numerous citations to federal cases. (Doc. 22). The State of Alaska moves to dismiss Welton's amended petition, arguing that she failed to

---

[5] Welton cites the Sixth Amendment right to choice of counsel in the portion of the petition arguing that denial of her right to testify was a structural error so serious there was no need to show harm. (Doc. 29-9 at 12). Citation to the Sixth Amendment for this purpose makes clear Welton was willing to assert a federal right when it assisted her advocacy.

*Welton v. Marshall*  Initial R&R re Motion to Dismiss
3:12-cv-00137-TMB-DMS  8

> It (a) wrongly suggests that the decision not to examine Jeremiah was tactical, rather than a mistake made out of ignorance, (b) fails to correct the trial court's ruling on competence, which conflated the two prongs of *Risher* by taking lack of prejudice to show competence, and (c) erroneously defers to the trial court's analysis of the record, which properly read, shows both incompetence and prejudice to Mrs. Welton.

(Doc. 29-9 at 2). Welton supported her argument on these three points with legal citations exclusively to Alaska caselaw, with the exception of a single citation to *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). (*See* Doc. 29-9 at 2-11). In its opposition, the State likewise relied exclusively on Alaska caselaw to support its argument, except for one citation, *United States v. DeCoster*, 624 F.2d 196, 211 (D.C. Cir. 1976). (Doc. 29-10 at 9). Throughout the Petition for Hearing, Welton argued that the state standards of ineffective assistance of counsel were violated. *Risher v. State*, 523 P.2d 421 (Alaska 1974) was cited in the text of the petition eleven times. The Supreme Court was urged to consult both prongs of the *Risher* test—the competency prong and prejudice prong. The federal standards articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), were not referenced anywhere in the petition. Nor was the Federal Constitution or the Sixth Amendment right to counsel.[5] The Alaska Supreme Court summarily denied Welton's petition in a one-page order. (Doc. 29-11).

### C) Federal Habeas Petition

Welton now seeks relief in Alaska's Federal District Court, under 28 U.S.C. § 2254. (Doc. 22). In contrast to her Alaska Supreme Court petition, Welton's federal petition specifically alleges that her Sixth Amendment rights were violated by Heath's failure to cross-examine Jeremiah about his statement and contains numerous citations to federal cases. (Doc. 22). The State of Alaska moves to dismiss Welton's amended petition, arguing that she failed to

---

[5] Welton cites the Sixth Amendment right to choice of counsel in the portion of the petition arguing that denial of her right to testify was a structural error so serious there was no need to show harm. (Doc. 29-9 at 12). Citation to the Sixth Amendment for this purpose makes clear Welton was willing to assert a federal right when it assisted her advocacy.

_Welton v. Marshall_  Initial R&R re Motion to Dismiss
3:12-cv-00137-TMB-DMS  8

exhaust the federal claim in her Petition before the Alaska Supreme Court. (Doc. 29 at 2). Specifically, the State argues that Welton did not fairly present to the Alaska Supreme Court the *federal nature* of her ineffective assistance of counsel claim. (Doc. 29 at 2). Welton counters that she did fairly present her claim because: (1) she cited a federal case, (2) the State cited a federal case in its brief in opposition to her petition, and (3) she cited Alaska caselaw that adopts the federal standard in her petition. (Doc. 31 at 3).

### III. RELEVANT LEGAL AUTHORITY

The exhaustion doctrine, first announced in *Ex Parte Royall*, 171 U.S. 241, 6 S. Ct. 734 (1886), is codified in 28 U.S.C. § 2254(b)(1)(A). It reads, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . .

Section 2254(b)(1)(A).

The exhaustion requirement is a rule of comity that "reduces friction between the state and federal court system by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999) (internal quotation marks, brackets and citations omitted). Thus, in order to fully exhaust her state-court remedies, a habeas petitioner's federal claim must be "fairly presented" to the state courts, *see Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); *Castille v. Peoples*, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989), including in a petition for discretionary review to the state's highest court, *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004) (dismissing petitioner's § 2254 petition because he failed to alert

the Oregon Supreme Court to the federal nature of his claim in his petition for discretionary review).

In order to "fairly present" a federal claim in a petition for discretionary review, "a petitioner must make reference to provisions of the federal Constitution or must cite either federal or state case law that engages in a federal constitutional analysis." *Fields v. Waddington*, 401 F.3d 1018, 1021 (9th Cir. 2005).

In *Galvan v. Alaska Dept. of Corrections*, 397 F.3d 1198, 1200-01 (9th Cir. 2005), the Ninth Circuit held that a petition for discretionary review to the Alaska Supreme Court which did not cite the Sixth Amendment or *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), relied entirely on Alaska law for what constituted ineffective assistance of counsel, and cited only one federal case to distinguish Alaska law from the federal standard, did not fairly present the federal nature of her ineffective assistance of appellate counsel claim. The *Galvan* court reasoned that the petitioner failed to do the bare minimum to preserve her federal claim—alert the Alaska Supreme Court that she was making a federal constitutional claim, stating:

> Briefing a case is not like writing a poem, where the message may be conveyed entirely through allusions and connotations. Poets may use ambiguity, but lawyers use clarity. If a party wants a state court to decide whether she was deprived of a federal constitutional right, she has to say so. It has to be clear from the petition filed at each level in the state court system that the petitioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition. . . . To exhaust a federal constitutional claim in state court, a petitioner has to have, at the least, explicitly alerted the court that she was making a federal constitutional claim. Galvan did not.

*Galvan*, 397 F.3d at 1204-05.

## IV. DISCUSSION

Here, the Court begins by noting that like *Galvan*, Welton's petition to the Alaska Supreme Court cited neither the Sixth Amendment nor the seminal federal ineffective assistance of counsel case, *Strickland v. Washington*. In this regard, her state petition contrasts dramatically with her current federal petition, which includes explicit references to the U.S. Constitution and numerous references to federal ineffective assistance of counsel cases.

To be sure, Welton did cite one federal case in her petition to the Alaska Supreme Court—*Wiggins v. Smith*, 539 U.S. 510, 535 (2003). (Doc. 29-9 at 7). Ninth Circuit precedent requires the Court to analyze *Wiggins* and the context of Welton's citation to *Wiggins* to determine if it was sufficient to fairly present her federal claim to the Alaska Supreme Court. *See Galvan*, 397 F.3d at 1202 ("The problem with Galvan's argument is not particularly the sparseness of federal law in her petition to the Alaska Supreme Court. Rather, the problem is the *context* in which Galvan cited her sole federal authority.") (emphasis added).

In *Wiggins*, during a capital sentencing proceeding, the petitioner's trial counsel failed to present mitigating evidence showing that he had suffered severe physical and sexual abuse at the hands of his mother and foster parents. 539 U.S. at 517, 123 S. Ct. at 2533. Instead, Wiggins' counsel challenged the defendant's direct responsibility for the victim's death, arguing that Wiggins did not kill the victim by his own hand. *Wiggins*, 539 U.S. at 514, 123 S. Ct. at 2543. This strategy failed, and Wiggins was sentenced to death. *Wiggins*, 539 U.S. at 515-16, 123 S. Ct. at 2532-33. In subsequent postconviction-relief proceedings, Wiggins alleged that his lawyers' failure to present mitigation evidence of his tortured childhood constituted ineffective assistance of counsel. *Wiggins*, 539 U.S. at 516-18, 123 S. Ct. at 2533-34. The Fourth Circuit held that Wiggins' lawyers made a strategic choice not to perform additional investigation into

Wiggins' childhood because "sordid details" could have surfaced that would have enhanced his sentence, instead of reducing it. *Wiggins*, 539 U.S. at 519, 123 S. Ct. at 2534. The U.S. Supreme Court reversed, holding that the lawyers' superficial investigation into Wiggins' past was insufficient upon which to base a decision to forego the presentation of a mitigation case. *Wiggins*, 539 U.S. at 524, 123 S. Ct. at 2536 ("Counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989."). As to prejudice, the Court reasoned that there was a reasonable probability that had the lawyers performed an adequate investigation into Wiggins' past, they would have put on a mitigation case at sentencing, and there was a reasonable probability that Wiggins would not have received the death penalty. *Wiggins*, 539 U.S. at 534-35, 123 S. Ct. at 2542-43.

In the instant case, Welton cited *Wiggins* to support her assertion that any reasonable attorney would have cross-examined Jeremiah about his statement. (Doc. 29-9 at 7). In other words, Welton argued that like the extreme record of abuse and neglect in the petitioner's past in *Wiggins* which no competent attorney would ignore during capital sentencing, Jeremiah's statement to police was so detrimental to the State's case that no competent defense attorney would refrain from using it on cross-examination. (Doc. 29-9 at 7). Welton's citation to *Wiggins* for this purpose was insufficient to fairly present to the Alaska Supreme Court a claim that her federal constitutional rights were violated. As presented, nestled among citations to Alaska law, *Wiggins* was cited to support Welton's claim that Heath performed below the minimum standard for Alaskan attorneys. *See Galvan*, 397 F.3d at 1204 (concluding that Galvan's use of a federal citation in the midst of her state-based claim demonstrated that she was

using the federal case to support her claim that "her lawyer performed below the Alaska minimum standard.").

Next, Welton briefly argues that the State's citation to a federal case in its Response to her Petition demonstrates that the federal nature of her claim was obvious. (Doc. 31 at 6). Specifically, the State wrote:

> Quoting *United States v. DeCoster*, 624 F.2d 196, 211 (D.C. Cir. 1976), the court of appeals has explained that
>
>> [A] millionaire might have retained counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection but to basic fairness. In the real world, expenditure of time and effort is dependent on a reasonable indication of materiality.
>
> *Jones*, 759 P.2d at 572.

(Doc. 29-10 at 9).

Welton's argument on this point suffers the same flaw as her argument that her sole citation to federal authority was sufficient—a fair reading of the State's brief shows that it used *DeCoster* to demonstrate Welton received constitutionally adequate counsel under Alaska law. *Jones*, a state case, quoted *DeCoster* for the proposition that a defendant is entitled to competent, as opposed to perfect, representation by counsel. The Response does not mention the Sixth Amendment, the Federal Constitution, or *Strickland v. Washington*. This sole citation, in the midst of citations to Alaska state cases, was insufficient to put the Alaska Supreme Court on notice that Welton was making a federal claim.

Finally, Welton argues that she fairly presented her federal claim to the Alaska Supreme Court by citing Alaska cases that utilize federal constitutional analysis. In *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003), the Ninth Circuit, sitting *en banc*, stated that, "for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same

purpose as a citation to a federal case analyzing such an issue." However, the court went on to explain that in order for a state case to qualify as "analyzing a federal constitutional issue" for purposes of exhaustion, that state must have adopted the federal constitutional standard as its state constitutional standard. *Peterson*, 319 F.3d at 1160-61. Specifically, the Ninth Circuit held that the petitioner's citation to Oregon state cases analyzing the federal standard for ineffective assistance of counsel claims was insufficient because Oregon caselaw was inconclusive as to whether Oregon had adopted the federal standard. *Peterson*, 319 F.3d at 1160-61 ("We need not decide whether, after [a Supreme Court case], citation of an identical or functionally identical state-law claim is sufficient to present a federal claim, for we cannot say that the Oregon and federal standards for constitutionally guaranteed right to counsel are more than merely similar."). In other words, in the Ninth Circuit, a citation to state cases can fairly present a federal constitutional claim only if that state has adopted the federal standard.

Because Alaska caselaw does not demonstrate that the Alaska and federal standards for constitutionally guaranteed right to counsel are more than "similar," Welton's petition to the Alaska Supreme Court suffered the same defect as the petitioner's in *Peterson*. Alaskan ineffective assistance of counsel rights are more robust than their federal counterparts. Unlike Oregon caselaw that was vague as to whether the Oregon Constitution provided identical rights to effective counsel, Alaska law, in the context of ineffective assistance of counsel claims, is "more protective of defendants' rights than the federal constitutional minimum." *Galvan*, 397 F.3d at 1203 (comparing Alaska Supreme Court holdings to the *Strickland* standard). Indeed, in *Alaska v. Jones*, 759 P.2d 558 (Alaska App. 1988)—the case Welton relies on to demonstrate that she cited Alaska cases that engage in federal constitutional analysis (Doc. 31 at 4-5)—the Court of Appeals distinguished Alaska's ineffective assistance of counsel test from the federal

test under *Strickland*, stating only that the standards are similar. *Jones*, 759 P.2d at 567-68. Welton's citations to Alaska state cases that noted relevant and similar federal cases were insufficient to alert the Alaska Supreme Court that she was raising a federal claim.

Welton argues further that her citation of a state case, which cites a federal case, *Kimmelman v. Morrison*, 477 U.S. 365, 106 S. Ct. 2574 (1986), for the proposition that a defense attorney's mistake made out of ignorance cannot later be validated as a tactical decision, put the Alaska Supreme Court on notice this was a federal claim. (Doc. 31 at 4). The citation was used to bolster her attack on the Court of Appeals' conclusion that the failure to cross-examine was a tactical decision, not an error or mistake. Yet throughout the state petition, the *Risher* standard was the vehicle for the attack. This reliance on a federal case cited in a state case is far too indirect and nuanced to fairly present a federal claim of ineffective assistance.

In addition, the non-federalization of Welton's petition to the Alaska Supreme Court may have been purposeful and strategic. As the Ninth Circuit has repeatedly pointed out, not raising a federal claim in state court postconviction proceedings can be a wise strategy to convince the highest court to grant discretionary review. *See Peterson*, 319 F.3d at 1159; *Galvan*, 397 F.3d at 1203 ("A capable attorney might well seek to keep Alaska court's attention on Alaska precedents, and avoid confusing the issue with the generally less favorable federal authorities.").[6]

## V. CONCLUSION

In order to comply with the exhaustion requirements of § 2254(b)(1)(A), Welton had to have "at the least, explicitly alerted the court that she was making a federal constitutional claim." *Galvan*, 397 F.3d at 1205. She did not. She failed to put the Alaska Supreme Court on notice

---

[6] As noted *supra*, Welton did not hesitate to cite the Sixth Amendment in other sections of her Petition for Rehearing.

*Welton v. Marshall*  Initial R&R re Motion to Dismiss
3:12-cv-00137-TMB-DMS  15

that she was claiming that her lawyers' oversight violated her federal constitutional rights. Therefore her federal claim of ineffective assistance of counsel was not exhausted in state court.

As noted above, Welton concedes that her remaining three claims are unexhausted in Alaska state court. Thus, because Welton's petition contains no exhausted claims, the Court recommends her petition be DISMISSED. *See Jiminez v. Rice*, 276 F.3d 478, 481 (9th Cir. 2001) ("Once [the government] moved for dismissal, the district court was 'obliged to dismiss immediately,' as the petition contained no exhausted claims.") (quoting *Greenawalt v. Stewart*, 105 F.3d 1268, 1274 (9th Cir. 1997)).

DATED this 21st day of August, 2013, at Anchorage, Alaska.

    /s/ Deborah M. Smith
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than CLOSE OF BUSINESS**, DECEMBER 5, 2013.** Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Miranda v. Anchondo, et. al, 684 F.3d 844 (9th Cir. 2012). A district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before CLOSE OF BUSINESS, **DECEMBER 12, 2013**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).